In the Matter of the Estate of ROBERT GATES, SR., Deceased. VIKI L. HATCH, as Administratrix of the Estate of ROBERT GATES, SR., Deceased, Respondent, et al., Petitioners; DONALD H. BRAHM et al., as Coadministrators of the Estate of CHERYL BRAHM, Deceased, et al., Appellants.

Third Department, April 8, 1993

### APPEARANCES OF COUNSEL

*Joseph A. Cutro,* Kinderhook, for Donald H. Brahm and another, appellants.

*Friedman & Manning, P. C.,* Delmar *(Jeremiah F. Manning* of counsel), for Nicholas Groudas and another, appellants.

*Connor, Curran & Schram, P. C.,* Hudson *(Daniel J. Tuczinski* of counsel), for respondent.

### OPINION OF THE COURT

MAHONEY, J.

The entangled estates involved in these appeals are those of the four victims of the much publicized 1986 Gates murders in the Town of Canaan, Columbia County, namely, Robert Gates, Sr. (hereinafter Gates), his son Robert Gates, Jr., his infant nephew Jason Gates (hereinafter Jason) and his live-in girl-

friend, Cheryl Brahm. Gates' then-17-year-old son, petitioner Wyley Gates (hereinafter Wyley), was charged with the murders and was convicted of conspiracy in the second degree in connection therewith (see, People v Gates, 189 AD2d 934; People v Gates, 153 AD2d 68, lv denied 75 NY2d 966).

While several civil tort actions were commenced against Gates' estate by the estates of the other victims, matters evidently proceeded without incident until March 1988 when petitioner Viki L. Hatch, the administratrix of Gates' estate, commenced a proceeding for an intermediate accounting. In this proceeding, Wyley petitioned for permission to file a late renunciation of his distributive share of Gates' estate. Notwithstanding the opposition lodged by respondents Donald H. Brahm, coadministrator of Brahm's estate (hereinafter Brahm's administrator) and Deloras Groudas, coadministrator of Jason's estate, Surrogate's Court granted the requested extension, concluding that reasonable cause had been shown for the delay, namely, the pendency of Wyley's criminal action which encompassed a period in excess of the statutory renunciation period, and accepted Wyley's proffered renunciation.

While respondents both filed notices of appeal from this order, they thereafter sought reargument and/or renewal claiming that new information had been uncovered that Wyley had accepted benefits from Gates' estate prior to executing the renunciation, thus precluding him from renouncing. Also at this time Brahm's administrator commenced a separate proceeding seeking a decree declaring Brahm to be Gates' common-law wife. Hatch cross-moved to dismiss. Surrogate's Court disposed of all matters in one decision. It denied the reargument/renewal motion on the ground that the assertedly "new" evidence, i.e., that $11,514.85 had been advanced by Gates' estate toward the costs of Wyley's criminal defense and a prior decision of Surrogate's Court granting the application of Wyley's legal guardian to receive $30,000 of the proceeds from Gates' profit-sharing plan of which Wyley was beneficiary and use it to pay his criminal defense fees, were matters of public record and thus not amenable to the label of newly discovered evidence. In any event, the court noted that these facts did not preclude renunciation inasmuch as the advance of moneys from the estate was made upon consent of all potential distributees and had since been reimbursed in full. With regard to the common-law marriage claim, which was based upon Gates' and Brahm's cohabitation during certain

short-term visits to Rhode Island on three occasions, Surrogate's Court found insufficient evidence to support the claim and granted Hatch's cross motion which it treated as one for summary judgment. Respondents filed notices of appeal from so much of this order as denied reargument/renewal; in addition, Brahm's administrator appealed from that part of the order dismissing the common-law marriage claim. All matters are now before us for disposition.[1]

Excluding those arguments which are raised for the first time on appeal and thus are not properly preserved for review,[2] the primary issues presented with regard to the renunciation are whether the disbursement of $11,514.85 in funds directly from Gates' estate and $30,000 from Gates' profit-sharing plan for purposes of paying the costs associated with Wyley's criminal defense renders him legally incapable of effecting a wholesale renunciation. While legal precedent on these issues is sparse, the guiding legal principles are nonetheless clear and easily stated. The beneficiary of a disposition, be it under a will, in intestacy or in a nonestate asset, freely may renounce his or her interest in whole or in part, that is, "with reference to specific amounts, parts, fractional shares or assets" (EPTL 2-1.11 [e]). The only caveat is that one may not renounce with respect to any property which he or she has accepted (EPTL 2-1.11 [f]). An interest in property is deemed accepted if the renouncer "voluntarily transfers or encumbers, or contracts to transfer or encumber all or part of such interest, or accepts delivery or payment of, or exercises control as beneficial owner over all or part thereof, or executes a written waiver of the right to renounce, or otherwise indicates acceptance of all or part of such interest" (EPTL 2-1.11 [f]).

■ Applying these principles to the instant situation, we

1. We note initially that while styled as reargument and/or renewal, the substance of respondents' postorder motions was reargument, the denial of which is not appealable (see, e.g., Matter of Kempf v Town of Esopus, 92 AD2d 1076, 1077).

2. A review of the record establishes that both respondents' proffered arguments relative to the timeliness of the renunciation (because the renunciation was executed after expiration of the nine-month period specified in EPTL 2-1.11 [b] [2], Surrogate's Court lacked discretion to permit a late filing) and relative to the timeliness of the application for an extension (namely, that it must be made prior to expiration of the nine-month period), were not advanced in the nisi prius court. Both these propositions, in any event, appear to have been expressly or impliedly rejected by case authority (see, Matter of Dominguez, 143 Misc 2d 1010, 1016; Matter of Ferrazzano, 124 Misc 2d 282; Matter of Palmeri, 75 Misc 2d 639, affd 45 AD2d 726, affd 36 NY2d 895).

note initially that acceptance by the guardian on Wyley's behalf of $30,000 from Gates' nonestate profit-sharing plan does not preclude him from now renouncing his distributive share of Gates' estate. The two dispositions are entirely separate and under EPTL 2-1.11 (e) can be separately accepted or renounced. Nor under the circumstances are we persuaded that the initial disbursement of funds from Gates' estate in furtherance of Wyley's criminal defense constitutes an acceptance thereof *by Wyley* within the meaning of EPTL 2-1.11 (f). A careful review of the record, more particularly Hatch's deposition, reveals that the $11,514.85 in advances were made during the period of Wyley's infancy and before a legal guardian had been appointed for him. Moreover, far from being a formal agreement, the arrangement was the result of an informal decision amongst the estate beneficiaries, namely, Hatch and Wyley's grandmother, Vivian Gates, that they should obtain legal counsel for Wyley and use estate assets in furtherance thereof, ostensibly as an advancement of Wyley's distributive share.

While undoubtedly Wyley was the ultimate beneficiary of the advanced funds, in our view something more than merely benefitting from an asset is necessary in order to be deemed to have accepted it. Acceptance, as that term has come to be used in both the traditional and the legal senses, connotes an act of voluntarily receiving something or consensually acceding to it. Implicit in the voluntariness of the act is the right and ability to reject that which is proffered. Those qualities simply are not present here. Not only were the advancements all made at a time when Wyley was an infant and under circumstances where he was all but powerless to reject, but also at a time when no legal guardian had been appointed to accept on his behalf. While the estate beneficiaries may have had the purest of motives in making the decision, the fact that it was their decision and not that of Wyley or of someone legally authorized to act on his behalf removes the modicum of voluntariness that is implicit in an acceptance. Indeed, when a legal guardian was appointed, application was made for permission to have the proceeds of Gates' profit-sharing plan be paid over to the guardian for use in paying Wyley's criminal defense costs. Upon receiving such approval, the guardian paid back the advanced sums to the estate in full.

■ Just as we discern no error in the rulings by Surrogate's Court relative to the renunciation, we likewise agree that summary judgment dismissing the petition was warranted as

regards the common-law marriage claim. Although New York no longer permits common-law marriages, one validly contracted in a sister State will be recognized as valid in New York. The law to be applied in determining the validity of such an out-of-State marriage is the law of the State in which the marriage occurred *(Matter of Mott v Duncan Petroleum Trans.,* 51 NY2d 289, 292; *see, Matter of Coney v R.S.R. Corp.,* 167 AD2d 582, 583, *lv denied* 77 NY2d 805; *Cross v Cross,* 146 AD2d 302, 306-307). While a review of Rhode Island law on this subject reveals that common-law marriages are recognized, in situations such as this where the relationship commences at a time when each is married to another a presumption arises that what was meretricious in its origins continues so in the absence of clear and convincing proof that the parties' conduct was of such a character as to lead to a belief in the community that they were married *(Sardonis v Sardonis,* 106 RI 469, 472-473, 261 A2d 22, 24).

In our view, Brahm's administrator failed to submit evidence sufficient to raise triable issues of fact regarding whether Gates' and Brahm's conduct rose to this level. In support of her cross motion to dismiss, Hatch submitted documentary evidence containing statements made by both Gates and Brahm while still alive that they were not married. In addition, evidence was submitted that Brahm was not mentioned in Gates' will, not listed as beneficiary of his pension, profit-sharing plan or life insurance policy, and that all their financial affairs were kept completely separate. Moreover, affidavits were presented by close friends indicating that both considered themselves single. The only papers submitted in opposition were the conclusory affidavit of a Rhode Island hotel operator that "[t]here was never any question in my mind but that they were married to each other" and similarly conclusory affidavits from two others that Brahm and Gates "considered themselves married", one of whom was the wife of Brahm's administrator. At best, these affidavits establish nothing more than that Brahm and Gates vacationed in Rhode Island under circumstances which suggested a romantic relationship. Such evidence falls far short of that required to sustain a common-law marriage under Rhode Island law.

We have reviewed respondents' remaining contentions and find them to be without merit.

WEISS, P. J., MIKOLL, LEVINE and MERCURE, JJ., concur.

Ordered that the orders are affirmed, without costs.